**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-447 (CJN)** |
| **JOSHUA CHRISTOPHER DOOLIN** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Joshua Christopher Doolin to 30 months imprisonment, the midpoint of the sentencing guidelines range calculated by the government, three years' supervised release, $2,256.65 in restitution, a $4,052 fine, and a $175 mandatory assessment.

### I.   INTRODUCTION

The defendant, Joshua Christopher Doolin, participated in the January 6, 2021 attack on the United States Capitol:   a violent attack that interrupted the certification of the 2020 Electoral College vote, threatened the peaceful transfer of power after the presidential election, injured over 100 police officers, and resulted in over $2.9 million in damages.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP").   The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-

Doolin was an active participant in that attack.   More than that, however, he was an *enthusiastic* participant.   Doolin traveled with his friends and family members to Washington, D.C. to participate in the "Stop the Steal" rally led by former President Trump.   While at the rally, he texted a friend that he "wouldn't mind dying with [his] family storming the capital [sic] on [his] birthday!"   GX 719.   True to his word, he then joined the mob that was attempting to take the Capitol.   Doolin made his way to the West Plaza, where he watched and filmed as his friends assaulted a line of police officers.   When the line broke, Doolin surged with the mob up the steps and onto the inaugural stage.   He then proceeded to the Upper West Terrace of the Capitol building, where he stole a USCP riot shield, and remained there for over an hour, observing the chaos below.   Doolin then relocated to the Lower West Terrace, where he joined a mass of rioters pushing against a police line in a narrow corridor leading from the inaugural stage to the interior of the Capitol building.   Throughout the day, Doolin narrated his actions, bragging about how he had braved tear gas, exclaiming how he and his friends were "trying to take the . . . Capitol," and proclaiming riot to be a "revolution."   After approximately three hours of rioting, Doolin left the Capitol grounds, taking the stolen riot shield as a souvenir.   Through his actions, Doolin showed that he was not a passive observer of the attack on the Capitol, but rather an excited participant, who strove to be at the front and center of the action.

For his actions the government recommends that the Court sentence Doolin to 30 months' incarceration, which is the midpoint of the Guidelines' range of 27 to 33 months, which the government submits is the correct Guidelines calculation.   Such a sentence reflects the gravity of Doolin's conduct, his utter lack of remorse, and the need to deter Doolin and others from ever

---

case evaluation.

again using force or violence in furtherance of their political goals.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Affidavit in Support of Criminal Complaint and Arrest Warrant filed in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.  *See* ECF No. 1-1 ¶¶ 5-10.

### B.     Doolin's Role in the January 6, 2021 Attack on the Capitol

#### a.  Doolin Anticipated Violence on January 6, 2021

Shortly before January 6, 2021, Doolin began making plans to travel with a group of family members and friends—approximately 15 people—to Washington, D.C., in order the attend the "Stop the Steal" rally.  But Doolin anticipated something far beyond a peaceful protest.  As he discussed preparations with his father, Doolin considered bringing an "AR"—a semi-automatic rifle—with him.  Doolin texted his father, "I guess I'm going to go bring my-your AR."  His father replied, "Put it in a case for travel . . . If y'all join up with a group like the proud boys y'all might be able to open carry."  And, in response to his father's inquiry about whether he had ammunition, Doolin responded that "Jonny"—his cousin and co-defendant, Jonathan Pollock— would have "mags," or magazines.

3





\*       \*       \*



*Government Exhibit 717*

4

Ultimately, Doolin did not bring a firearm and ammunition to the Capitol on January 6. However, his consideration of it, and his father's suggestion that he "open carry" with an organized group such as the Proud Boys, is illustrative of his mindset in traveling to Washington, D.C.:   He contemplated not only a show of support for President Trump, but a show of force.

### b.   Doolin's Intention to Storm the Capitol

As mentioned above, on the morning of January 6, Doolin and his group attended the "Stop the Steal" rally and listened to speeches by then-President Trump and other speakers.   Well before the rally ended, however, Doolin's intent to storm the Capitol was clear.   A little before 11:30 a.m., prior to the commencement of Trump's speech, Doolin told his friend that "we are just waiting on the word to go to the capital!!!" and "Trump should be coming up any minute!   Then to the Capital!"





*Government Exhibit 719*

When his friend responded, "don't get killed on your birthday bro," Doolin texted "I wouldn't mind dying with my family storming the capital [sic] on my birthday!"







*Government Exhibit 719*

At trial, Doolin admitted that by "storming, " he meant a military maneuver.   Mar. 14, 2023 Trial Tr., at 97:14-15.

### c.   Doolin's Conduct on the Capitol Grounds

Approximately two hours later, Doolin did storm the Capitol.   He and other members of his group, including his co-defendants Jonathan Pollock, Joseph Hutchinson, Michael Perkins, and Olivia Pollock, approached the Capitol from the southwest.   They crossed the restricted perimeter that the USCP and Secret Service had established around the Capitol building and portions of the Capitol grounds.[2]   Doolin filmed the group's approach on his cellphone and narrated as he filmed, noting "a lot of fences and a lot of barricades" and commenting that the fencing "hasn't done very good so far."   GX 714.24 at 01:18-01:24.   He then added, "we've got as far as the steps.   There's their fences all laying on the ground."   *Id.* at 01:25-01:30.   But the fences were not Doolin's only indication that the area was restricted.   As he approached the Capitol building, from as far out as the street near Garfield Circle, he observed that it "sounds like the cops are shooting rubber bullets and macing people."   *Id.* at 01:03-01:11.

By approximately 1:56 p.m., Doolin's group was on the south side of the West Plaza, where police had established a line along a set of steps in an attempt to prevent the mob from advancing further.   For approximately half an hour, Doolin remained in that area, experiencing the effects of the crowd-control spray that officers employed in order to keep the encroaching crowd back, and watching and filming as his friends and relatives attacked and were repelled by the police.

---

[2] This perimeter was established with bike racks and "snow fencing"—a plastic mesh screen— with officers posted periodically around the perimeter.   GX 104, 109, 1201 at 2.   On several fences, signs were posted instructing people not to enter the area.   GX 108, 1201 at 2.

By approximately 2:04 p.m., Doolin had worked his way close the front of the mob. Doolin watched as his friends and other rioters attacked the police line, charging at and slamming into the officers.   *See* GX 305 at 1:02:38-1:03:58 (2:04:38 p.m.-2:05:58 p.m.), GX 306 at 19:30-20:27 (2:04:01 p.m.-2:04:58 p.m.), GX 307 at 1:00:08-1:01:01 (2:04:04 p.m.-2:05:05 p.m.), GX 403 at 00:08-00:50, GX 404 at 00:00-00:25, GX 405 at 00:03-00:25, GX 406 at 00:07-00:15.



*Government Exhibit 306 at 19:47 (2:04:19 p.m.)*
*Doolin (circled in red) looks on as Jonathan Pollock (circled in green) and*
*another cousin of Doolin (circled in orange) charge at the police line.*

Doolin advanced towards the line of offices, and started up the steps, but turned back after being hit with chemical spray.   *See* GX 306 at 19:46-19:52 (2:04:18 p.m.-2:04:23 p.m.).

At approximately 2:12 p.m., Doolin's friends again attacked police.   As officers descended the steps, Doolin filmed on his cellphone as Joseph Hutchinson and Olivia Pollock grappled with them.   *See* GX 714.8.

9



*Government Exhibit 714.8 at 00:00:05*
*Doolin films as Joseph Hutchinson (circled in gray) and Olivia Pollock*
*(circled in light blue) grapple with police officers.*

As discussed above, in addition to observing officers' use of chemical irritant on the

assembled mob, Doolin himself was struck with spray.   After one occasion where he was sprayed,

Doolin retreated and filmed a selfie-style video in which he showed off his inflamed face and asked

"Where were you on January 6th?   We're trying to take the state capitol."   GX 714.23 at 00:00-00:08.



*Still image from Government Exhibit 714.23*
*Doolin, after having been sprayed with chemical irritant.*

Despite the barriers, despite the chemical spray, despite police officers' placement of their own bodies between the rioters and the Capitol, Doolin not only remained on the West Plaza, he pressed farther, eager to "take the Capitol."   *See, e.g.*, GX 714.3, 714.15, 714.38.   Doolin put himself at the forefront of the mob as rioters continued to battle police.



*Government Exhibit 411 at 00:09*
*Doolin (circled in red) presses forward, yelling,*
*as rioters battle police officers on the West Plaza*



*Government Exhibit 317 at 11:41 (2:31:38 p.m.)*
*Doolin (circled in red) up against the police line on the West Plaza*

When the police line broke and the officers fell back, Doolin and his fellow rioters surged forward towards a set of stairs leading to the inaugural stage.   From there, Doolin celebrated what they had accomplished.   As he filmed rioters streaming up the steps, he cheered, "now it's ours, and we're taking our Capitol back.   We're taking our Capitol back, baby!"   GX 714.3 at 00:04-00:10.   He then switched the video to film himself.   Bleary-eyed, having been sprayed with chemical irritant, Doolin reiterated, "I can't really see or breathe, but we're taking it back."   *Id.* at 00:10-00:13.

Doolin climbed up to the inaugural stage at approximately 2:43 p.m., as rioters were pouring into a corridor connecting the area of the inaugural stage (the "Lower West Terrace") to the interior of the Capitol building, often referred to as the "Tunnel."   GX 411 at 00:06.   Those rioters advanced into the Tunnel towards a set of double doors, behind which police officers were stationed.   The rioters smashed through those doors and physically engaged law enforcement with batons, poles, chemical spray, bottles, and other items.   *See* GX 321.1 0:55:50-1:19:53 (2:43:06 p.m.-3:07:10 p.m.).   The violent and physical battle for control over the Tunnel area continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat.[3]   Several officers

---

[3] Former MPD Officer Michael Fanone has described the combat in the Tunnel as follows:   "The fighting in the lower West Terrace tunnel was nothing short of brutal.   Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers.   Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line."   *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the Tunnel entrance potentially saved the lives of others, including potential harm to members of Congress, some of whom were sheltering nearby.

Doolin would join this battle approximately an hour and a half later, but first he continued climbing to the Upper West Terrace of the Capitol building, where risers had been erected.   There, he filmed the crowd below and around him and bragged, "they're tear gassing us, they're hitting us with batons, they're macing us, it don't matter, we're standing together . . . that is a beautiful sight right there folks."   GX 714.5 at 00:15-00:56.   In another video from the risers, Doolin pointed his camera at the crowd and explained, "We're taking the Capitol, fellas.   We are the American people."   GX 714.15 at 00:00-00:06.   In other videos, he referred to the rioters' actions that day as a "revolution," filming the media tower on the Capitol grounds and yelling "This is the revolution!   That was theirs!   That was their tower!   That was all theirs! . . . . When your kids ask you where you were on January 6, 2021, tell them you helped take America back!"   GX 714.4. *See also* GX 714.28 at 00:00-00:03 ( "In case you were wondering, this is what a revolution looks like."); *id.* at 00:46-00:48 ("This is the revolution!").

By approximately 3:45 p.m., Doolin had stolen a U.S. Capitol Police riot shield that he would carry with him for the rest of the day.   He filmed a video on the Upper West Terrace of himself holding the stolen shield, proclaiming "I got a riot shield!"   GX 714.25.



*Still image from Government Exhibit 714.25*
*Doolin carrying a USCP riot shield.*

Half an hour later, Doolin returned to the Tunnel and used that riot shield against the police. By 4:16 p.m., he was again on the Lower West Terrace, where he joined the crowd that was pushing against police, trying to break the line that was keeping the rioters from entering the Capitol.



*Government Exhibit 504*
*Doolin (circled in red) holding the riot shield*
*at the entrance to the Tunnel.*

Though several rows back from the police line, Doolin used the riot shield to press forward and

lend his weight and force to the rioters' efforts to push through the officers in the Tunnel.



*Government Exhibit 416 at 00:02 and 00:29*
*Doolin (circled in red) pushes with the mob of rioters and advances into the Tunnel.*

Each row of rioters supported and reinforced the others, pushing against the officers in an almost

medieval style of combat.   Doolin was an active—and enthusiastic—participant in that combat.

Over the course of a few minutes, he advanced from the exterior of the Tunnel to several feet inside

the Tunnel.   *See* GX 205 01:56-05:05 (4:16:56 p.m. to 4:20:05 p.m.).



*Government Exhibit 205, 1:56 (4:16:56 p.m.)*
*Doolin (circled in red) uses the riot shield to push with rioters*
*and advance into the Tunnel.*



*Government Exhibit 205 at 5:05 (4:20:05 p.m.)*
*Doolin (circled in red) has advanced further into the Tunnel.*

Around 4:21 p.m., six minutes after Doolin had entered, officers succeeded in temporarily expelling rioters from the Tunnel; many rioters tumbled out of the Tunnel and several were trampled by the mob.   Doolin reluctantly backed down the steps leading to the Tunnel, but held onto the riot shield even when it got stuck.   GX 205 5:34-5:55 (4:20:34 p.m.-4:20:55 p.m.); GX 416 at 04:03-05:04.   He was still carrying the shield several minutes later when MPD Officer Miller was dragged out of the Tunnel and into the crowd.

Doolin left the vicinity of the Tunnel a little before 5:00 p.m., still carrying the stolen riot shield, now with an American flag draped over it.   *See* GX 420 at 02:57-03:03.   Doolin took the shield back to Florida with him, where he and his friends signed it: a trophy of their time storming the Capitol together.

19



*Government Exhibit 713.14*
*USCP riot shield with signatures of Doolin (circled in red) and others.*

### C.    Doolin's Statements to the FBI

On June 30, 2021, FBI agents arrested Doolin at the firehouse where he worked.   Doolin

agreed to be interviewed.   During the course of the interview, Doolin admitted to entering the

Capitol grounds on January 6, 2021, but asserted that, even though he understood that law

enforcement was trying to get the crowd to leave, he did not feel that he was trespassing because

the Capitol was "the American people's building" and President Trump had said they could be

there.   GX 501 at 16:15-17:05.   Doolin repeatedly, and falsely, claimed he did not witness any

violence on January 6, including by his co-defendants.   GX 501 at 12:35-13:30 (claiming he did

not partake in any violence or confrontations with police), 32:48-32:57 ("Everybody that I was

around was pretty mild-mannered, other than, like, when we were, like, it was the point of, like,

'Let's take…,' like, when we were gonna take the Capitol, but everybody was still mild mannered

about it"); 32:57-33:06 (claiming he never saw Jonathan Pollock being violent and describing

Jonathan Pollock as "hyper just like everybody else was"), 34:37-34:58 (claiming that Joseph

Hutchinson only pushed officers in response to being pushed or being pepper sprayed).

### D.    Doolin's Concealment of Evidence and False Trial Testimony

Though proud of his actions on January 6, Doolin also knew that what he did was illegal.

Accordingly, when FBI agents interviewed Doolin following his arrest, Doolin claimed he had

deleted his photos or videos from January 6.   Mar. 8, 2023 Trial Tr. at 170:7-15; GX 501 at 26:20-

26:43 (Q: "The photographs that you took, are they still on your phone or on your social media?"

A: "Um, I don't think so.").   In fact, Doolin had kept this evidence, hiding it through the use of

the "Keepsafe" application, which enables users to hide media on their phones, by moving them

out of the photo album and into a separate password-protected storage space.[4]   When the FBI later

examined his cellphone, agents found numerous videos and photographs that had been stored in

the Keepsafe app.   *See* Mar. 9, 2023 Trial Tr. 75:14-76:17, 80:8-81:4, 85:16-17, 86:22-23, 87:4-

89:3.   Indeed, during cross examination, Doolin conceded that he had moved photos and videos

from January 6 to the Keepsafe app.   Mar. 14, 2023 Trial Tr. at 84:20-86:2.   He then incredibly

asserted that he might have forgotten that the evidence was in the Keepsafe app when he was

---

[4] Keepsafe also enables users to backup media in a "cloud" account, maintained by Keepsafe.

interviewed by the FBI, or that the evidence might have somehow been moved into the Keepsafe app *after* the phone was seized by the FBI.[5]   *Id.* at 88:11-89:3.

This was not the only instance of Doolin providing false testimony at trial.

For example, Doolin testified that, when he approached the Capitol, he did not see any barriers or signs indicating that the area around the Capitol was restricted.   Mar. 13, 2023 Trial Tr. at 189:11-13 (Q: "And as you approached that red line, did you see any barricades or signs?" A: "No."); *id.* at 191:8-12 (Q: "While you were walking up that sidewalk, did you see any barricades or signs saying, 'This is a restricted area'?" A: "Not, like, in the sidewalk or in the sidewalk area, no.").   This was directly contradicted by his own videos, referenced above, which showed the fencing and in which he commented on the fact that "a lot of fences and a lot of barricades . . . ha[ve]n't done very good so far" and noted "fences all laying on the ground."   GX 714.24.   Indeed, in its verdict, this Court noted that "[v]ideos extracted from Doolin's phone confirm his knowledge of the barriers and his knowledge that his fellow protestors had taken some of them down."   Mar. 15, 2023 Trial Tr. 12:10-12.

Doolin also denied knowing or intending the obvious meaning of things he said on January 6, 2021.   For instance, he claimed that the phrase "we're taking the Capitol back," something he yelled in multiple videos that he filmed that day (for example, GX 714.3, 714.15, 714.38), had no

---

[5] Records from Keepsafe indicate that, on the evening of June 30, 2021 – the day of Doolin's arrest – a user accessed Doolin's Keepsafe account and performed actions suggesting an attempt to delete material.   The FBI did not focus on the presence of the Keepsafe app on Doolin's phone until August 2022 and, at that point, sought an additional search warrant for Doolin's cellphone in order to attempt to recover additional material.   The FBI also served a search warrant on Keepsafe itself in August 2022.   At that point, there were no materials pertaining to January 6, 2021 in Doolin's Keepsafe account, indicating that far from being *added* to the application following his arrest, such material was removed.

meaning to him:

> Q.    What did you mean by "We're taking the Capitol back?"
> A.    I didn't mean – I'm just echoing chants of people in the crowd to mess with friends and family.
> Q.    So it had no meaning to you?
> A.    No, but if you see the location – I'm sorry.   Go ahead.
> Q.    But you kept – you kept repeating that phrase though?
> A.    Yeah, yeah, a lot of people were repeating that phrase.   I was just – most of my videos are just me echoing chants of the crowd.
> Q.    So you had no idea what they meant?
> A.    I believe I knew what they meant but they weren't my words.
> Q.    What did they mean?
> A.    That they were taking the Capitol.
> Q.    What does it mean to take the Capitol?
> A.    I don't know, stand on it.

Mar. 14, 2023 Trial Tr. at 63:3-21.   Doolin also denied knowing what he meant when he said, "We never would have gotten through that wall if there weren't so many of us," GX 714.21, a clear reference to the rioters' breaking through the police line and ascending up the inaugural stage to the Upper West Terrace.   When asked about it at trial, Doolin feigned ignorance, saying "Again, just scripting.   I'm not sure what I meant by the video now.   It's been two years."   Mar. 14, 2023 Trial Tr. at 66:25-67:3.   Doolin also claimed he didn't know what he meant when he said in yet another video, "Let's show the American people what we can do if we stick together." GX 714.21.   Doolin testified that, "I just – I don't know if I was repeating it or just making up the script as I went along, but it was just a video to send to friends and make them think, Oh, my gosh! What's going on."   He added "[I]n a lot of videos I'm just kind of repeating chants and stuff." Mar. 14, 2023 Trial Tr. at 65:25-66:10.

Doolin also lied about why he contemplated bringing an assault rifle to Washington, D.C. At trial, Doolin claimed he planned to go hunting or shooting with his father on his way to or from Washington, D.C.   Mar. 13, 2023 Trial Tr. at 177:15-178-:6; Mar. 14, 2023 Trial Tr. at 91:5-23.

This assertion is contradicted by the rest of the text chain, which makes no mention of hunting. As discussed above, after Doolin wrote to his father, "I guess I'm going to go bring my-your AR," his father's response was not to recommend a hunting spot or shooting range.   Nor was it to agree to bring his hunting rifle as well.   Rather, his father replied, "Put it in a case for travel . . . If y'all join up with a group like the proud boys y'all might be able to open carry."   GX 717.   Although Doolin attempted to brush off his father's response as "goofing around," Mar. 14, 2023 Trial Tr. at 92:12-13, the implication is clear:   Doolin's father thought there would be a possibility of Doolin "open carry[ing]" with the Proud Boys, that is, carrying his weapon for show, to an event, as part of an organized group, and understood his son to be contemplating bringing a firearm as a show of force.   Nor was this an unreasonable understanding: Doolin himself contemplated violence at the Capitol when he told his friend, as mentioned above, that "I wouldn't mind dying with my family storming the capital [sic] on my birthday!"   GX 719.

Doolin also lied about why he joined in the melee outside the tunnel.   According to Doolin, it had nothing to do with his loudly expressed goal to take the Capitol; he claimed he did so to help a girl he believed had been wounded inside.   Mar. 13, 2023 Trial Tr. at 231:7-14 ("[T]here was a little girl inside.   She's bleeding.   I heard it from a lot of people in a real short period of time. So at that point, I was trying to – going to try to make my way inside to see if I could help aid in that situation.   And I – so I left down from the top terrace and quickly made my way down to the lower terrace down toward what they refer to as 'the tunnel.'").   This is not credible.   *First*, when interviewed by the FBI about what he was doing at the entrance to the Tunnel, Doolin said nothing about a little girl or anyone else being wounded.   To the contrary, he said there were "a bunch of people attempting to go in.   So I went down there to try and go in with them" and explained that

24

he and the other rioters "were trying to go inside, but they weren't letting us go inside so we never made it in."   GX 501 at 58:25-58:58.   *Second*, on cross-examination, he admitted that at the time he joined this part of the riot, he had no idea where in the Capitol building this allegedly wounded person was located.   Mar. 14, 2023 Trial Tr. at 113:20-114:10.   The simple truth is that Doolin eagerly joined the violent attempt to infiltrate the Capitol, not to render aid, but to overpower the police officers and assist the mob in its goal of entering the Capitol.

Doolin made other false statements at trial.   For instance, despite filming rioters fighting with the police, Doolin testified that he did not see any rioters behaving violently.   Doolin equivocated even after he was shown a video of Jonathan Pollock attempting to pull a police officer backwards by the neck and shoulders and over a railing.   Mar. 14 Trial Tr. at 58:8-18 (Q: "So if Jonathan Pollock intended to jump on that railing . . . . [a]nd intended to grab that officer . . . . [t]hat's not violent?" A:   :I don't know if I would say it's violent. I don't know if he was trying to climb over the railing.   I don't know if he was – I'd say violent would have been if he pulled that officer over that railing, yeah.   I would say that was violent.").   He testified that he did not intend to steal the riot shield, and initially didn't even recognize it as belonging to law enforcement despite it having a huge U.S. Capitol Police logo on it.   Mar. 13 Trial Tr. at 235:5-13 (Q:   "When you received the shield from this person, did you see markings or identification on it that it belonged to the United States Capitol police?   A:   "Not at the time."   Q:   "But at some point in time you did?"   A:   :I did.   I have it on the videos."   Q:   "And when you received this shield, did you intend to steal the shield?"   A:   "No.").   Finally, Doolin testified that he had no memory of carrying the shield after the incident involving Officer Miller.   Mar. 14, 2023 Trial Tr. at 128:11-23.   This was implausible, as evidence showed that he carried it with him as he descended

the inaugural stage, GX 420 at 02:57-03:03, and that he brought the shield back to Florida, and that he and several companions autographed it,   GX 713.14, GX 640 (photograph of interior of the Pollocks' residence).   Indeed, although Doolin still maintains that he did not steal the riot shield and bring it back to Florida, *see* PSR at 30 (objection to ¶¶ 28, 41), two members of the larger group that Doolin traveled with to Washington, D.C. told the FBI that it was Doolin who loaded the riot shield into the group's van after they left the Capitol grounds and one of those individuals recalled that it was Doolin who brought the shield to the Pollocks' residence for people to sign.

### III.   THE CHARGES

On July 13, 2022, a federal grand jury returned a superseding indictment charging Doolin with five counts:   Theft in a Federal Enclave, in violation of 18 U.S.C. § 661 (Count Sixteen), Theft of Government Property, in violation of 18 U.S.C. § 641 (Count Seventeen), Interfering with Law Enforcement During Civil Disorder in violation of 18 U.S.C. § 231(a)(3) (Count Eighteen), Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Twenty-Two), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Twenty-Four).   On March 15, 2023, Doolin was convicted of Counts Seventeen, Eighteen, Twenty-Two, and Twenty-Four following a bench trial.

### IV.   STATUTORY PENALTIES

Doolin now faces sentencing on one count of Theft of Government Property, in violation of 18 U.S.C. § 641, one count of Interfering with Law Enforcement During Civil Disorder in violation of 18 U.S.C. § 231(a)(3), one count of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and one count of Disorderly and Disruptive

Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

As noted by the Presentence Report issued by the U.S. Probation Office, Doolin faces up to five years of imprisonment for violating 18 U.S.C. § 231(a)(3) and one year of imprisonment each for violating 18 U.S.C. § 641, 18 U.S.C. § 1752(a)(1), and 18 U.S.C. § 1752(a)(2).   PSR at ¶¶ 115-118.   Doolin faces up to three years of supervised release for violating 18 U.S.C. § 231(a)(3), and up to one year of supervised release each for violating the other statutes.   *Id.* at ¶¶ 123-124.   Doolin faces a fine of up to $250,000 for violating 18 U.S.C. § 231(a)(3) and up to $100,000 each for violating the other statutes.   *Id.* at ¶¶ 141-142.   Doolin faces a mandatory special assessment of $100 for violating 18 U.S.C. § 231(a)(3) and $25 each for violating the other statutes.   *Id.* at ¶¶ 143-144.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government disagrees with the guidelines calculations for Count Twenty-Two and Twenty-Four.   The government also submits that the four counts of conviction form three groups pursuant to U.S.S.G. § 3D1.2, and that the offense level for Count Seventeen therefore must be calculated separately.

### A.   Count Seventeen (18 U.S.C. § 641)

The offense level for Count Seventeen is 8, calculated as follows:

| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(A) | Less than $6,500 Loss | +0 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **8** |

## B.    Count Eighteen (18 U.S.C. § 231(a)(3))

The offense level for Count Eighteen is 15, as calculated in paragraphs 57-62 of the PSR.

## C.    Counts Twenty-Two (18 U.S.C. § 1752(a)(1)) and Twenty-Four (18 U.S.C. § 1752(a)(2))

The offense level for Count Twenty-Two is 15, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Trespass on a Restricted Building or Grounds | +2 |
| U.S.S.G. §2B2.3(c)(1) | Cross reference to Count Eighteen | |
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **15** |

The offense level for Count Twenty-Four is also 15, calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **15** |

For both counts, the PSR did not apply a three-point enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A).   This enhancement applies when "the offense involved physical contact" and is warranted here because (1) Doolin pushed up against the police line on the West Plaza, bringing himself into physical contact with MPD officers, *see* GX 317 1:11:27-1:11:58 (2:31:24 p.m.-2:31:54 p.m.), and (2) Doolin used his body weight and the riot shield to push other rioters against the police officers in the Tunnel, *see* GX 205 02:00-04:57 (4:17:00 p.m.-4:19:57 p.m.), GX 416 at 00:00-00:34.[6]   Although Doolin did not personally touch the police officers in the Tunnel, he was

---

[6] The PSR applied this same enhancement to Count Eighteen, based on Doolin's pushing of other rioters against police officers in the Tunnel.   PSR at ¶ 58.

part of a mob that did, and himself aided the rioters that did make direct contact. *See* U.S.S.G. § 1B1.2(a)(1). Indeed, a defendant need not himself make direct contact for this enhancement to apply. *See, e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415 (7th Cir. 2000) (interpreting § 2A2.4(b)(1)(A) by comparing to the law of battery, in which "the contact between the aggressor and the victim need not be direct, but rather can result from the 'indirect application of force ... by some substance or agency placed in motion by' the aggressor"); *United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016) (application of § 2A2.4(b)(1)(A) was appropriate because the defendant "could reasonably foresee that his actions could bring about further physical contact between [his co-defendant] and the officers"). And, in the context of January 6 cases, this enhancement has been applied to defendants who participated in efforts to break through police lines, even if they were not in the "first row" of rioters. *See, e.g., United States v. Price*, 22 Cr. 106 (CJN) (defendant in third row of rioters attempting to break police line on the West Plaza); *United States v. Baugh*, 22 Cr. 313 (JEB) (defendant joined "heave ho" efforts in the Tunnel).

Doolin objects to the PSR's application of U.S.S.G. § 2A2.4 to Counts Twenty-Two and Twenty-Four. PSR at 30. He argues that U.S.S.G. § 2B2.3 should instead apply to both, and that the cross-reference in § 2B2.3(c)(1) should not apply because Doolin did not commit the offenses with the intent to commit a felony offense. The evidence is clear, however, that Doolin did enter and remain in and engage in disorderly and disruptive conduct in a restricted area with the intent of interfering with law enforcement officers during a civil disorder – Count Eighteen – a felony. Doolin relocated from the Upper West Terrace to the inaugural stage, both within the restricted area, and pushed his way up to and into the Tunnel, in order to join the efforts to break through the police line and gain entry to the Capitol building.

### D.    U.S.S.G. § 3C1.1

Doolin also objects to the application of U.S.S.G. § 3C1.1 to each of his counts of conviction and asserts that he was exercising his Constitutional rights in testifying at trial.   PSR at 29.   To be clear, the government does not seek to apply this enhancement because Doolin testified at trial.   This enhancement applies because Doolin testified *falsely* on multiple occasions at trial and because he attempted to conceal evidence from the FBI.

A two-point enhancement under § 3C1.1 applies when:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1.   Examples of obstructive conduct include "committing, suborning, or attempting to suborn perjury," "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" and "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense"   U.S.S.G. § 3C1.1 n.4.   As outlined in Section II.D above, Doolin did all of these things.   He concealed evidence of his actions on January 6 by moving photos and videos from that day into the Keepsafe app.   He deceived FBI agents about whether there were any images from January 6 on his phone. And he testified falsely repeatedly and on multiple topics.

### E.    Grouping

The government submits that the four counts of which Doolin was convicted form three groups:

Group One – Count Seventeen.   Count Seventeen, theft of government property in violation of 18 U.S.C. §641, has an offense level of 8, as calculated in Section V.A above.

Group Two – Count Eighteen.   Count Eighteen, obstructing, impeding or interfering with law enforcement officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3), has an offense level of 15, as calculated in paragraphs 57-62 of the PSR.

The PSR and Doolin erroneously group Counts Seventeen and Eighteen together, on the grounds that they involve the same victim.   U.S.S.G. § 3D1.2(b), PSR ¶ 53, *id.* at 30.   This is not so.   "Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."   U.S.S.G. § 3D1.2 n. 2.   The victim of Count Seventeen is the USCP as an entity, the owner of the riot shield that Doolin stole.   In contrast, the victims of Count Eighteen are the individual officers present in the Tunnel when Doolin and other rioters were pushing into the police line.   Those officers include officers from the MPD and likely the USCP.   Because there are separately identifiable victims, these counts form separate groups.

Group Three – Counts Twenty-Two and Twenty-Four.   Count Twenty-Two, entering and remaining in a restricted building or grounds in violation of 18 U.S.C. §1752(a)(1), and Count Twenty-Four, disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. §1752(a)(2), are grouped together because they involve the same victim:   Congress.   U.S.S.G. § 3D1.2(a).   As laid out in Section V.C above, the highest offense level for this group is 15.

The offense level for Group One (8) is seven levels less serious than the offense level for Groups Two and Three (15).   Group One therefore counts as one-half unit, while Groups Two and Three each count as one unit pursuant to U.S.S.G. § 3D1.4.   This results in an increase of

three offense levels, resulting in a Combined Offense Level of 18.

### F.    Guidelines Range

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 78.   A Combined Offense Level of 18, as calculated above, and a Criminal History Category of I result in a Guidelines range of 27 to 33 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Doolin's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Doolin trespassed over the Capitol grounds' restricted perimeter, noting that putting up barricades "hasn't done very good so far."   GX 714.24.   He watched his friends attack police.   He joined the mass of protesters pushing against police to break through the narrow tunnel that connected the inaugural stage to the Capitol building itself.   And he stole a U.S. Capitol Police riot shield, later autographing it and keeping it as a souvenir.   The nature and circumstances of Doolin's offenses are serious and support the government's recommended sentence of 30 months.

### B.    The History and Characteristics of the Defendant

According to the Presentence Report, Doolin had a "very good childhood and upbringing," and experienced no instances of abuse or neglect.   PSR at ¶ 88.   None of his family members struggled with substance abuse or mental health.   *Id.*   He also reported that he never suffered

from, or been treated for, any mental health or emotional health problems. *Id.* at ¶ 97. In short, Doolin had none of the characteristics that might mitigate his actions at the Capitol. Moreover, Doolin was trained and worked as an Emergency Medical Technician. He therefore should have been acutely aware of gravity of the riot that was unfolding at the Capitol and the stress and danger that he and other rioters were causing for the police that day.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Doolin's criminal conduct on January 6 disrespected the law and contributed to one of the country's greatest threats to representative democracy. Doolin's insistence, through trial, that his presence at the Capitol was peaceful and that he witnessed no violence that day further highlights how little respect Doolin has for the democratic process, for the duties law enforcement performed that day, and for this Court.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### a. General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### b. Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a substantial term of incarceration, for two reasons.   *First*, Doolin bragged about his behavior on the day of the attack on the Capitol.   He showed pride in what he did, stealing a riot shield stolen from the U.S. Capitol Police, filming a video about it, and autographing his souvenir.   *Second*, Doolin has never expressed remorse for his actions, including after being arrested or at trial.   To the contrary, as described above, Doolin lied repeatedly at trial, asserting that he hadn't seen the fencing designed to keep him and his fellow rioters away from the Capitol, claiming ignorance about the reasons for his own statements, and offering implausible explanations for joining the fight in the Tunnel and for contemplating bringing an assault rifle to Washington, D.C.   To this day, he refuses to acknowledge that he stole the riot shield.   Most troublingly, however, Doolin's refusal to recognize the violence that occurred at the Capitol on January 6 – despite his own participation and that of his friends and relatives – evidences a mindset that will find a way to justify future violence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See* Sentencing Hearing Tr. at 49, *United States v. Smocks*, 21-cr-198 (D.D.C. Oct. 24, 2021) ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here:  https://www.justice.gov/usao-dc/capitol-breach-cases.  To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Miller*, 21-cr-119 (CJN), the defendant brought with him rope, a grappling hook, a mouth guard, and a bump cap—tools that he referred to as "riot gear"—and said that he "looked forward" to fighting what he called the "soft" law enforcement officers in Washington, D.C.   Miller used social media to threaten public figures, including Senator Charles Schumer, Mark Zuckerburg, and Jack Dorsey.   He was so disruptive on the East Front of the building that he was twice detained, the second time resulting in him being put in handcuffs. Miller instead stayed at the riot, initially filming himself talking about a revolution.   Miller then forced his way past the Capitol Police and entered the Rotunda, making it to the old Senate Chamber before being turned back to the Rotunda.   He also assaulted an MPD sergeant and engaged in a physical altercation with at least six officers.   Finally, in response to Congresswoman Ocasio-Cortez's social media post to "Impeach," Miller directly responded: "Assassinate AOC."

On the morning of trial, Miller pled guilty to nine counts: three counts of violating 18 U.S.C. § 231(a)(3), and one count each of violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 18 U.S.C. § 1752(a)(3); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(E); and 40 U.S.C. § 5104(e)(2)(G).   During a break in trial, Miller pled guilty to the remaining counts as well: violations of 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 875(c).   This Court concluded that Miller's total offense level was 20 and his criminal history category was I, resulting in a Guidelines range of 33 to 40 months.   This Court imposed a 38 month sentence.

There were several parallels between Miller's case and Doolin's.   Like Doolin, Miller was "at the forefront of every barrier overturned, police line overrun, and entryway breached within

his proximity that day." *United States v. Miller*, 21-cr-119 (CJN), ECF No. 141 (Government Sentencing Memorandum) at 2.   Like Doolin, Miller considered bringing a gun to the Capitol that day.   *Id.* at 8.   Like Doolin, Miller excitedly filmed his actions, even using the same language of a "revolution."   *Id.* at 14 (noting that Miller recorded himself saying, "We stormed Congress. We got stopped at the door right now, but we might get in in a minute.   This is a real revolution, right?   Yeah buddy.").   And like Doolin—who took a USCP riot shield as a souvenir and filmed himself narrating how proud he was on January 6—Miller was delighted by what he had done, writing friends that what he'd done was "really beautiful," and that he was "[s]o fucking proud" of "scar[ing] the shot [sic] out of members of Congress."   *Id.* at 23-24.   Miller engaged in additional threatening conduct, that Doolin did not, including threats against various public figures. And Miller was convicted of an assault, which is one reason that his Guidelines range was higher than Doolin's.

In *United States v. Price*, 22-CR-106 (CJN), the defendant was a regional leader of the Proud Boys who not only violently attacked law enforcement officers during the attack on the Capitol, but also organized, encouraged, and directed others to do so.   Price led a small group to the West Plaza.   He and his group pushed through the crowd of rioters to get to the front line of the mob's conflict with the police and Price interfered with officers who were attempted to effect an arrest..   Price subsequently posted messages on Facebook in which he bragged about his violent conduct against the officers and took credit for breaking through the police line and escalating the riot.

Price pled guilty to one count, a violation of 18 U.S.C. § 231(a)(3).   This Court determined that Price's total offense level was 11 and criminal history category was III, resulting in a

Guidelines range of 12-18 months' imprisonment.   This Court imposed a sentence of one year and one day.

There are several similarities between Price's case and Doolin's.   Both sought to place themselves at the front of the mob, close to the action.   Both bragged about their actions.   And while neither made direct physical contact with police, both joined in crowds to use their collective force to attack officers.   In contrast to Price, however Doolin stole government property, refused to accept responsibility, concealed evidence, and testified falsely.

In *United States v. Hamner*, 21-CR-689 (ABJ), the defendant was one of the first rioters to breach the perimeter fencing around the Capitol on January 6, himself tearing down snow fencing after other rioters broke through the police line at the Peace Circle.   Hamner fought with police officers on the West Plaza, wrestling over the bike rack barricades and working with other rioters to ram a large billboard directly onto officers.

Hamner pled guilty to one count, a violation of 18 U.S.C. § 231(a)(3).[10]   The Court determined that Price's total offense level was 11[11] and criminal history category was V, resulting in a Guidelines range of 24-30 months' imprisonment.   The Court imposed a sentence of 30 months.

While both Hamner and Doolin utilized objects in a coordinated effort to break through a

---

[10] Hamner was also charged with a violation of 18 U.S.C. § 111(a)(1) and (b) and an additional count of violating § 231(a)(3).   He pled to a single count, without a plea agreement. The remaining charges are still pending.

[11] Although the government argued that the Court should apply U.S.S.G. § 2A2.2 (via the cross-reference in § 2A2.4(c)) on the grounds that Hamner's assault with the billboard was an aggravated assault, the Court declined to do so and calculated the guidelines only under § 2A2.4.

police line, Hamner's chosen object – a metal billboard – was larger and more effective than Doolin's riot shield.   And, although Hamner had a more significant criminal history than Doolin, Hamner received credit for his acceptance of responsibility (at least as to the count of conviction), and did not conceal evidence or testify falsely.

In *United States v. Baquero*, 21-CR-702 (JEB), the defendant, after entering the Capitol building, joined a group of rioters attempting to push police officers out of the Rotunda.   This effort was unsuccessful; when additional officers arrived and tried to remove rioters from the Rotunda, Baquero put himself at the front of the line of rioters resisting and confronting the police. He reached out and grabbed the hand of one officer, who was holding a baton.   Later in the day, Baquero pushed open a door and braced his back against it in order to keep police officers from closing the door.   He then pushed an officer who had torn him away from the door.

Baquero pled guilty to one count, a violation of 18 U.S.C. § 231(a)(3).   The Court determined that Price's total offense level was 17[12] and criminal history category was I, resulting in a Guidelines range of 24-30 months' imprisonment.   The Court imposed a sentence of 18 months, crediting the defendant's remorse and work in the community.

Baquero's violent acts were of a similar nature as Doolin's – both joined with others in an attempt to resist and/or break through a police line.   Baquero engaged in more incidents of interference with officers, but unlike Doolin, he accepted responsibility, pled guilty, and did not obstruct justice.   And while the Court credited Baquero's remorse, Doolin has expressed none.

---

[12] The Court applied U.S.S.G. § 2A2.2 rather than § 2A2.4.   Had the Court applied § 2A2.4, the resulting offense level likely would have been 13.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   *First*, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). *Second*, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).   *See Fair*, 699 F.3d at 512 (citation omitted).   Here, Doolin was convicted of offenses under Title 18; the VWPA does apply.   In addition, Doolin's conviction of Count Seventeen, Theft of Government Property, has "an identifiable victim" that has "suffered . . . a pecuniary loss" – the United States Capitol Police; the MVRA applies to that count as well.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and

"shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the defendant's relative role in the causal process that underlies the victim's general losses").
*See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Doolin to pay $2,000 in restitution for his convictions on Counts Eighteen (Civil Disorder), Twenty-Two (Entering and Remaining in a Restricted Building or Grounds), and Twenty-Four (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) and $256.65 – the value of the stolen riot shield -- for his conviction on Count Seventeen (Theft of Government Property).   This amount fairly reflects Doolin's role in the offenses and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon base amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Doolin's conviction under 18 U.S.C. § 231(a)(3) subjects him to a maximum fine of $250,000, and his convictions under the other statutes subject him to a maximum fine of $100,000 for each statute.   In determining whether to impose a fine, the sentencing court should consider

the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   As the Presentence Report notes, Doolin raised over $4,000 from the crowdfunding site GiveSendGo, and he appears to be capable of paying both restitution and a fine.   PSR at ¶ 114.   To date, Doolin has raised $4,052.   PSR at ¶ 94.   Doolin's page on the website said that the money was for "Travel & Housing Expenses To DC For Court." *See* Government Exhibit A, attached.   The website did not indicate that the funds were used to cover legal expenses, and, in any event, Doolin has court-appointed counsel in this matter.   Doolin should not be able to capitalize on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months imprisonment, three years' supervised release, $2,256.65 in restitution, a $4,052 fine, and a $175 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:

Benet J. Kearney
Assistant United States Attorney
One Saint Andrew's Plaza
New York, NY 10007
benet.kearney@usdoj.gov
(212) 637-2260
Benet.Kearney@usdoj.gov

Brendan Ballou
Special Counsel
DC Bar No. 241592
950 Constitution Avenue NW
Washington, DC 20530
(202) 431-8493
Brendan.Ballou-Kelley@usdoj.gov